Good morning, Your Honors, and may it please the Court, my name is Mark Ebert and I represent Ms. Sesley Williams. I'd like to start with some discussion of the first three robberies, the ones on December 28th and 29th of 2012 and the one on January 3rd, 2013. And the reason I wanted to start with those is because the government lumps together these robberies by someone other than Mr. Munerlin with the ten that follow, and in fact these robberies are very different from those and they constitute about two-thirds of Ms. Sesley's, Ms. Williams' sentence. The Court already knows that Munerlin didn't participate in those first three robberies because he was in jail and said he didn't know anything about it, and that the actual robber, and it's most likely two robbers, in the first three robberies were never proved, never identified in Ms. Williams' case. So there were no witnesses to either her presence or her involvement or, and this is important, her prior knowledge, if any, that these robber or robbers were going to use guns during those events. And was the evidence the same, the ping telephone, was that the connection? That is what the government says was a part of the, what they call the pattern. But the pattern that they said, and I will answer that, but the pattern that they told the jury was that it was always a U.S. bank, it was always inside a grocery store, they take the note and they get the money. But in fact, it was not that. Two of these first three robberies were of retail establishments that were not involved in the subsequent Munerlin robberies. The only one that was a bank was a U.S. bank robbery, one of 20 in the Las, excuse me, one of 20 in the Las Vegas area. And yes, the only thing that ties them, ties Ms. Cecily to basically any of these robberies, but certainly for the first three, where Munerlin didn't have anything to say, was that one of her two phones was in the same vicinity, which was a three-square-mile area, the same three-square-mile area of the robberies, and that in two of those three robberies, one of her phones connected with Jordan's phone. Jordan was somebody that both she and her son or daughter or her kids knew. That wasn't a stranger. And it was never proved that he was involved in any of those three robberies. Also the gun. I'm sorry? The government claims that there was some consistency about the gun. Actually, I would submit that there was inconsistency because there were, for two reasons. One is that there were three guns. There's a gold gun, a silver gun, and a black gun, which according to Munerlin, if it was the same gun, was a BB gun. And in the first three robberies, guns were used. In the next ten, the Munerlin robberies, only two of them involved a gun, at least that anyone saw. And these were, other than their colors, these guns were not even identified. Nobody said, well, this is a semi-automatic, this is a revolver, this is a .38, this is a .45. My point is that giving somebody a note and saying give me the money and then taking the money and leaving, that's generic. That is robbery 101. That is not a pattern. And nor is the use of a gun in some but not all robberies a pattern. Again, that is very generic. Really the only thing we have is the fact that one of her cell phones was in the vicinity. And again, under the Rosamond case, the Supreme Court case, there has to be evidence that she had prior knowledge that in these first three robberies that the robber or probably two robbers were going to use a gun. And, you know, in the other robberies, we at least How far apart are their various locations? They're in various, I can't tell you a number of miles, excuse me, but there was a map and they are located all over the city of Las Vegas and also the city of Henderson, which is near. So in order to be, I mean, these locations are not locations where we have any reason to think she was frequenting and they're far apart from each other, essentially. I don't know how far apart from each other they were. What I know is that they were all, except for one in Henderson, were in Las Vegas. She lives in Las Vegas. Las Vegas is a big place. It's a big place, but it's not that big if you're talking about a three-square-mile area around a bank, which is downtown, okay? And there are hundreds of thousands of people within those three-square-miles. Again, I just want to emphasize, because I'm not sure it was in the brief, the Rosamond case and the requirement of some evidence, some evidence of prior knowledge in the three robberies where Munnerlyn was not involved and there was no testimony. And I do think that the guns were different. And, by the way, there were three guns used in all three of the first robberies but only two of the next ten. So, again, where's the pattern here? In short, I just want to say that I don't believe you can lump these three robberies together with the ones that Munnerlyn committed, showing only that the proximity of one of Ms. Williams' cell phones was somewhere within three miles of the robbery locations. Moving on, I don't know if the Court is interested in the carpenter issue, but it is an issue of first impression in this circuit. Are there cases in other circuits regarding the good-faith exclusion? There are, Your Honor. Less than half of them and not in the Ninth Circuit. So for this circuit, it's a case of first impression. And those other cases do not, at least last time I shepherdized them, probably a couple weeks ago, none of them address the issue of what Jones had to say about this issue. And in Carpenter, six of the justices ---- You think it could have been inferred from Jones or at least they should have been on notice from Jones? Absolutely. Absolutely. And as far as I know, this is also an issue of first impression. I don't think it's been argued before. Okay. Now, to go to the next issue, which is the 923C, the Hobbs Act robbery. Okay. We have a lineup of cases with priority. Is that correct? That is correct. And that's why I made that my third issue, because I ---- So if we thought we were going to get to that issue, we'd have to essentially vacate submission and wait. I don't know about vacating submission, but I think you would probably end up waiting. I have four separate appeals, which three of them are stayed pending, Begay and Vuong, and one, they actually had oral argument and they've been waiting like a year or something. Well, the benchmark for us is when they had oral argument. I'm sorry? The benchmark for us is when they had oral argument, but there were cases which did have oral argument. There was one, one of mine, I think it's either ---- I think it was Mr. Weeks. Vuong or something like that. No. Vuong is the one that they're waiting for, I believe. Weeks is my case, W-E-I-C-K-S, where they had oral argument and they've just been waiting and waiting, and although they didn't say it, I strongly suspect they're waiting for Luong. So, yes, I think that's the case. Actually, I have a minute and a half left. I was going to ask to reserve that, but if the Court wants to hear more, I'll certainly keep on going. I'm fine. Okay. Thank you. Thank you. Good morning. May it please the Court. Adam Flake for the United States. I did want to point out something that came up during opposing counsel's argument, and that is one of these robberies did occur all around the Las Vegas Valley in Las Vegas as well as in Henderson, but one also occurred in Prim, Nevada, which is several miles away. I was trying to look it up during the argument, but I think it's ---- please don't hold me to this, but I think it's about 15 miles out of town. Is that one of the first ones? No, it was not one of the first ones. One of the ten. It was one of the subsequent ones. That's correct, Your Honor. Well, what about ---- let's start with the first three robberies where we don't have the Mr. whatever his name is testifying. Bunderland, yes. What is the connection of her to that? I mean, in any ordinary sense of adequate evidence. There are two connections, Your Honor. One is the cell site data, the Williams and Jordan's phones. Well, suppose we didn't have the next ten robberies. Let's just suppose we didn't have the next ten. Would that be enough? Would it be enough just by itself? No, Your Honor. So it's just because you have the series? Yes, Your Honor. That's part of it. So ultimately you're depending on the co-defendant's testimony with regard to all of the robberies, not just the ones that he was involved in? Your Honor, I mean, we certainly are relying on his testimony. If it totally dropped out, that would be a different case. If it hadn't existed, that would be a different case. But the reason that the ten subsequent robberies matter is the description of the gun, because the cell site data is one thing, but witnesses in the first three robberies describing a gun that is ---- Well, but one of them said it was dark gray or black, right? That doesn't sound like silver and white. That's true, Your Honor. And I think it bears emphasizing here the standard of review that the Court is applying. That witness did say that about the gun, and the jury was free to make of that what they wanted to. Well, I understand that, but that still goes to the question. You're saying there was a consistency about the gun, but there wasn't a consistency about the gun. Your Honor, that witness's one statement was calling the gun black was inconsistent. But I did point out in my brief that we introduced a picture of the robber holding the gun of that robbery. It's at ER 63. Yeah. I looked at that. Well, maybe I just don't have good eyes, but I couldn't make much sense out of it. Go ahead. It just goes to reemphasize the point that this was a matter for the jury to determine. The jury could give what weight they wanted to to the witness's statement that the gun used in that robbery was black. It could find that the witness was simply ---- Is there some evidence directly tying her to that gun? Could you please repeat? Is there some evidence directly tying her to that gun? Your Honor, only the pattern in Munderland's statement saying that she gave him the gun. So Munderland did testify to that at trial. He described the gun. He said it was a pewter gun with a pearl handle. He did testify to it at trial that she gave him the gun, or he didn't say? Munderland did testify at trial that she gave him the .22 pistol with the pewter color. But those were the guns. He testified as to the gun that he used during the ten robberies, correct? Yes, Your Honor. So if she had been indicted on the first three robberies and not the other ones and tried on those first three robberies, then you would agree she couldn't have had ---- there wasn't enough evidence there for a jury to come back with a guilty plea. It would have been a hard argument that it was foreseeable to her that the robber would use a gun in those first three robberies if we didn't know that it was her gun from the subsequent robberies. That's correct, Your Honor. Or that she was in the vicinity. We would know that she was in the vicinity of the first three robberies because of the cell site data. What about ---- is it true, I didn't think it was, that in the next ten robberies there was only a gun in two of them? No, Your Honor. The gun was ---- if I can just consult my notes, I apologize. So the February 14th robbery, it was described twice. That's correct, Your Honor. The ---- in other of the robberies, including in Count 12, which I talk about with regard to the sentence, Munderland made reference to a gun. He had a gun in his pocket. He subsequently told probation that he was carrying the .22 at the time, but he didn't display it. Nobody saw. But in terms of a pattern, there was no pattern of going in with a gun and showing a gun. It wasn't ---- I wouldn't go so far as to say there was no pattern at all. It wasn't exactly consistent. He didn't do the exact same thing in every case. But there's a fairly big difference between showing a gun and not showing a gun. Well, sometimes he showed it, and sometimes he said he had it, and sometimes he gestured towards it. He was not the most believable person in the world. I agree with you, Your Honor, 100 percent. But even then, he told the probation he didn't testify that he had that gun, correct? Not on that. Not on Count 12. He did tell probation. And as I ---- Well, what about the rest, though? The representation was that it was only in two of the next ten robberies that for which he was convicted that he had a gun. He had to show the gun. If I could have one moment, Your Honor. So I'm just going through on page 5 of my brief. It talks about the February 14th robbery, 514, he showed a gun. February 14th, 559, he showed a gun. February 14th, 745, he showed a gun. All right. Well, I will ask where that's coming from because I didn't think that was the case either. But go ahead. It's just a very ---- Do you have any similar case that you can point to where somebody was convicted with no evidence where anybody ever ---- There's no direct ---- I mean, I understand circumstantial evidence is fine. But here the circumstantial evidence is A, we have Munderland for whatever he is worth as to some of the robberies, ten if not three. And then other than that, we have where she was and some of them we have a gun, period. That's what we've got. Is that right? That's right, Your Honor. We have the first three, we have the gun. And some connection to this Jordan guy. Yes, Your Honor. Although nobody saw him either. That's correct, Your Honor. And nobody saw it. Did anybody see a getaway car? Do we know there was a getaway car? Other than Munderland saying it, we don't have any evidence other than that. So basically in the end, even though there was an attempt to walk away from Munderland, without Munderland you don't have a case. I think that it would be a difficult case to be able to describe the importance of the cell site data. In the end you have to say they could have believed Munderland. I think they did believe Munderland insofar as his testimony was corroborated by the cell site data. I'll readily admit that it would be a hard case to explain to the jury without the significance of the cell site data if we didn't have a witness explaining what was going on. But the combination of the cell site data and the witness testifying in a way that is consistent with the cell site data was, I don't think the jury acted irrationally in crediting that evidence. Okay. Do you want to say anything about the other two issues? Not unless the Court has any questions. Well, maybe one sentence about why the good faith exception applies, despite Jones. Jones was a case about GPS tracking of vehicles. Oh, yes. But there was certainly, I don't know if they could say they knew that this was going to be illegal, but I don't know that they have to know that. Do they have to know that as opposed to have some, you know, good inkling that there's a very important festering issue and a lot of consideration of whether this is, in fact, illegal? I think that, I don't mean to be indirect about answering Your Honor's question, but I think that Nevada police officers need to be able to rely on an opinion from the Nevada Supreme Court about the validity of these types of orders. There was a Nevada Supreme Court order subsequent to Jones saying that this was valid. I think it would be a massive, massive paring back of the doctrine of good faith if our officers can't rely on Nevada Supreme Court. Okay. Thank you very much. Thank you, Your Honor. Thank you. In my remaining minutes, I'd like to ---- It would be helpful to me to ---- I'm confused about your representation that there was only a gun in two of the next ten robberies. Okay. Because she was only charged with and only convicted of aiding and abetting the brandishing of a gun, the showing of a gun, as you said, in two of those robberies, one of which ---- I know, but ---- One of which Munderland says was a BB gun, whereas the assumption by the government that there were other guns involved were things like, well, at one point he reached towards his waistband, things like that. No other witness in any of those other ten robberies actually saw a gun, and she wasn't charged with those. Or testified they saw a gun. Exactly. And he was never charged, she was never charged with that. In terms of the fact of a gun, no gun was ever recovered here from anybody. And the silver gun, the fact that one of the guns in one of the robberies was silver and another one was silver, there are 330 million guns in civilian hands in this country. I don't know how many of them are silver, but again, that goes more to the generic thing. One could have been a revolver, one could have been semi-automatic, we don't know. But the only way you get to that issue at all is through Munderland's testimony. And lastly, I just wanted to say that the idea that there was a pattern between what Ms. Williams was involved in in the first three versus the later ten robberies. Keep in mind that in the later ten robberies, we're talking about Munderland, somebody who had raped her, who had choked her, who had beaten her, who had sent her to the hospital twice, who'd gone to prison twice for doing that, who'd gone to prison for filing a false police report against her, and who she was so afraid of that the district attorney moved her to a different place to hide her from Mr. Reynolds. Kagan. But you'd have to be saying that because of all that, he is no juror, no rational jury could rely on what he said at all. Is that what you're saying? Because of that and other things I said in my brief, yes. Yes. And in fact, the government said to the jury, you can't believe me. But in that theory, he shouldn't have been allowed to testify, period. I was a Federal prosecutor once during my misspent youth, and I would not have called him out, but, you know, that's what they did. But my point in that, and I know I'm over my time, is simply, you know, if you believe that somehow these two sets of robberies are related, essentially a pattern related to Ms. Williams, you have to believe not only that she was telling the first one or two robbers how to rob, but she was also directing Munderland. Let me just ask you a practical question. Yes, sure. If it turns out after all these stacked-up cases that Hobbs Act robbery doesn't count, how much of that sentence, her sentence, does that affect? Well, let's see. I think it was three of them were Hobbs Act. If I'm right about that, that would reduce her sentence by 75 years, plus perhaps some lesser amount on the underlying 14 years, which was for 13 robberies as opposed to, you know, fewer robberies. I see. Okay. Thank you very much. Thank you. Thank you both for your helpful arguments in United States v. Williams. We will go on to Marroquin v. Whitaker, and then we will take a break.
judges: Gould, Berzon, Marquez